1  NICHOLAS A. TRUTANICH
   United States Attorney
2  District of Nevada
   Nevada Bar Number 13644
3  ROBERT KNIEF
   Assistant United States Attorney
4  501 Las Vegas Boulevard South, Suite 1100
   Las Vegas, Nevada 89101
5  Telephone: 702-388-6336
   Robert.Knief@usdoj.gov
6  *Representing the United States of America*

7

                    UNITED STATES DISTRICT COURT
8                        DISTRICT OF NEVADA
                              -oOo-
9
   United States Of America,              )   Case No.  2:19-mj-500-BNW
10                                         )
              Plaintiff,                   )   CRIMINAL COMPLAINT
11                                         )
        vs.                                )   VIOLATIONS:
12                                         )
   Gregorio Godinez, and                   )   Count One:
13 Elio Ramirez-Guerrero,                  )   21 U.S.C. §§ 846, 841(a)(1) and
                                           )   (b)(1)(A)(viii)- Conspiracy to Distribute a
14            Defendants.                  )   Controlled Substance
                                           )
15                                         )   Counts Two – Four:
                                           )   841(a)(1) and (b)(1)(B)(viii) – Distribution
16                                         )   of a Controlled Substance
                                           )
17                                         )   Count Five:
                                           )   21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii)
18                                         )   Possession of a Controlled Substance with
                                           )   Intent to Distribute
19                                         )
                                           )   Count Six:
20                                         )   18 U.S.C. §§ 924(c)(1)(A)(i) - Possession of
                                           )   Firearm in Furtherance of a Drug
21                                         )   Trafficking Offense
                                           )
22                                         )   Count Seven:
                                           )   922(g)(1) and 924(a)(2) – Possession of a
23 _____        )   Firearm by a Prohibited Person

1    BEFORE the United States Magistrate Judge, Las Vegas, Nevada, the undersigned

2    complainant, being duly sworn, deposes and states:

3                                    Count One
                    (Conspiracy to Distribute a Controlled Substance)

4    Beginning on an date unknown, but prior to May 2019, and continuing up to and

5    including July 2, 2019, in the State and Federal District of Nevada,

6                                Gregorio Godinez, and
7                                Elio Ramirez-Guerrero,

8    defendants herein, did knowingly and intentionally combine, conspire, confederate, and

9    agree to distribute 500 grams or more of a mixture and substance containing a detectable

10   amount of methamphetamine, a Schedule II substance, in violation of Title 21, United

11   States Code, Sections 841(a)(1) and (b)(1)(A)(viii), and 846.

12                                   Count Two
                     (Distribution of a Controlled Substance)

13   That on or about May 9, 2019, in the State and Federal District of Nevada,

14                                Gregorio Godinez,

15   the defendant herein, did knowingly and intentionally distribute 50 grams or more of a

16   mixture and substance containing a detectable amount of methamphetamine, a Schedule II

17   Controlled Substance, in violation of Title 21, United States Code, Sections 841 (a)(1) and

18   (b)(1)(B)(viii).

19
                                     Count Three
20                   (Distribution of a Controlled Substance)

21   That on or about June 5, 2019, in the State and Federal District of Nevada,

22                                Gregorio Godinez,

23

                                         2

the defendant herein, did knowingly and intentionally distribute 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Sections 841 (a)(1) and (b)(1)(B)(viii).

## Count Four
### (Distribution of a Controlled Substance)

That on or about June 20, 2019, in the State and Federal District of Nevada,

Gregorio Godinez,

the defendant herein, did knowingly and intentionally distribute 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Sections 841 (a)(1) and (b)(1)(B)(viii).

## Count Five
### (Possession with the Intent to Distribute a Controlled Substance)

That on or about July 2, 2019, in the State and Federal District of Nevada,

Gregorio Godinez, and
Elio Ramirez-Guerrero,

defendants herein, did knowingly and intentionally possess with the intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Sections 841 (a)(1) and (b)(1)(A)(viii).

## Count Six
### (Possession of a Firearm in Furtherance of a Drug Trafficking Crime)

That on or about July 2, 2019, in the State and Federal District of Nevada,

Gregorio Godinez,

3

defendant herein, did knowingly possess a firearm in furtherance of a drug trafficking crime for which he may be prosecuted in a Court of the United States, that is, Conspiracy to Distribute Controlled Substances as charged in Count One and Distribution of a Controlled Substance as charged in Count Five of this Indictment, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i).

Count Seven
(Possession of a Firearm by a Prohibited Person)

On or about July 2, 2019, in the State and Federal District of Nevada,

Gregorio Godinez,

defendant herein, having been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm, that is, a silver 9 mm semi-automatic handgun (Model 1911), said firearm having been shipped and transported in interstate commerce, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

Complainant, as a Special Agent with the Drug Enforcement Administration, states the following as and for probable cause:

1.      I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and have been so employed since September 2018.  I am an "investigative or law enforcement officer" of the United States and am empowered by law to conduct investigations, make arrests, and execute search warrants.  I am currently assigned to the DEA Las Vegas District Office ("LVDO").  Within the LVDO, I am assigned to the Clark County Gang Task Force ("CCGTF").  Prior to attaining sworn status as a SA, I was employed by DEA and received approximately 17 weeks of training in narcotics trafficking investigations and related legal matters at the DEA Training Academy in Quantico, Virginia.

4

2.      Prior to employment with DEA, I was a commissioned law enforcement officer in the State of New Mexico for more than 13 years.  While serving as a law enforcement officer in the State of New Mexico, I served in several capacities within both patrol and criminal investigations divisions.  During my tenure as a law enforcement officer in the State of New Mexico, I conducted numerous investigations, to include drug trafficking, complex conspiracies, and money laundering.

3.      During the course of my law enforcement career, I have received several hundred hours of comprehensive, formalized instruction to include such topics as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of narcotics traffickers' telecommunications devices, criminal law, surveillance, undercover operations, and other investigative techniques. Throughout my career, I have conducted numerous investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of narcotics and controlled substances, the laundering of narcotics proceeds, and conspiracies associated with narcotics offenses.

4.      The following is based on my own investigation or was provided to me by other law enforcement officers.

5.      I have not included every fact known to me concerning this offense. I have set forth only the facts I believe are essential to establish the necessary foundation for this complaint.

6.      On May 9, 2019, Gregorio GODINEZ (hereinafter referred to as "GODINEZ") contacted an undercover DEA Task Force Officer (hereinafter referred to as "UC") via telephone and inquired about UC meeting him to purchase

1    methamphetamine. GODINEZ and UC agreed to meet at a specified timeframe.

2    GODINEZ and UC also agreed to meet at the Lowe's parking lot, which is located at

3    2875 Charleston Blvd., Las Vegas, Nevada 89104. At approximately the agreed upon

4    time, UC arrived at the Lowe's parking lot.

5          7.    After negotiations about changing the meet location, GODINEZ

6    subsequently arrived in the parking lot. GODINEZ attempted to have the UC move to his

7    location in the parking lot, however the UC was able to convince GODINEZ to park near

8    the UC. GODINEZ subsequently parked next to UC in a gold Toyota Rav4, which had

9    previously been identified. UC exited his vehicle and engaged in a conversation with

10   GODINEZ. During the conversation, GODINEZ expressed his disliking of the location

11   (UC advised that GODINEZ appeared to be nervous and paranoid).

12         8.    GODINEZ and UC subsequently conducted a drug transaction.

13   GODINEZ provided UC with blue paper towels that were wrapped around a plastic bag

14   which contained a clear crystallized substance that UC immediately recognized as being

15   consistent with methamphetamine.[1] In return, UC provided GODINEZ with $1,500.00 of

16   DEA OAF. UC and GODINEZ then discussed a potential future transaction for one

17   pound of methamphetamine. GODINEZ tentatively offered UC a price of $2,400.00 and

18   stated that he would have to verify the price with "his brother, who is the main guy." UC

19   and GODINEZ subsequently departed the area.

20         9.    On the morning of June 5, 2019, UC received an SMS message from

21   GODINEZ. UC and GODINEZ subsequently engaged in a conversation, via SMS

22

23   [1] The suspected methamphetamine was subsequently processed at DEA's Las Vegas District Office. The suspected methamphetamine weighed 262.7 gross grams and yielded a presumptive positive field test for methamphetamine.

1     messages. During the conversation, UC and GODINEZ agreed to meet later in the day

2     and conduct a drug transaction. UC and GODINEZ negotiated for UC to purchase one

3     pound of methamphetamine for $2,600.00

4           10.     A few hours later, UC sent GODINEZ an SMS message and indicated that

5     UC was about to arrive into town (UC's backstory included being from out-of-state). UC

6     and GODINEZ engaged in another conversation via-SMS messaging. During the

7     conversation, UC and GODINEZ engaged in negotiations, in reference to a meet location

8     to conduct the previously agreed upon drug transaction. After several messages, UC

9     finally agreed to meet at a parking lot that GODINEZ had persistently suggested. The

10     agreed upon parking lot was at "Ava's Video Poker Bar," 3935 E. Charleston Boulevard,

11     Las Vegas, Nevada. It should be noted that GODINEZ expressed his comfort with the

12     location, due to his friend being the owner and/or operator of the business.

13           11.     A few minutes after agreeing upon a location, UC arrived at the agreed

14     upon meet location. UC drove past Ava's Bar and parked near "Pep Boys" (which is

15     located in the same parking lot, adjacent to Ava's Bar). GODINEZ subsequently walked

16     from Ava's Bar towards UC's vehicle. UC then exited his vehicle and greeted

17     GODINEZ. UC and GODINEZ engaged in a conversation about several topics, to

18     include Ava's Bar and firearms. During the conversation, GODINEZ received a

19     telephone call (confirmed by court authorized pen register, trap and trace device). While

20     on the phone, GODINEZ was heard discussing the arrival of another individual.

21     GODINEZ then told UC, "he is coming right now on a motorcycle" (with the

22     methamphetamine). UC and GODINEZ continued with their conversation. A few

23     moments later, GODINEZ made another telephone call and UC could hear GODINEZ

1   asking an individual where they were at (confirmed by court authorized Pen, Trap and

2   Trace). Upon terminating the call, GODINEZ told UC that he was "going to go back to

3   the bar and bag it up" (referring to the packaging of methamphetamine). GODINEZ then

4   walked back towards Ava's Bar.

5         12.   A few minutes later, an unknown male was observed entering the parking

6   lot of Ava's Bar on a motorcycle. The unknown male was wearing a blue shirt and a

7   closed face helmet. The unknown male was observed meeting with GODINEZ near

8   GODINEZ' vehicle. A short time later, GODINEZ' vehicle was observed driving

9   towards UC's vehicle. UC exited his vehicle and met with GODINEZ as UC stood

10  outside of the driver's door of GODINEZ vehicle. GODINEZ had a McDonald's bag in

11  his lap and he gave the bag to UC. UC opened the bag and observed a plastic, vacuum

12  sealed bag, which contained a crystallized substance.[2] UC gave GODINEZ $2,600.00

13  OAF, at which time GODINEZ gave the money to the front passenger seat of

14  GODINEZ' vehicle. UC and GODINEZ subsequently gave each other departing

15  salutations and UC entered into his vehicle. UC then departed the parking lot.

16        13.   On the morning of June 20, 2019, UC sent a SMS message to GODINEZ.

17  UC and GODINEZ subsequently engaged in a conversation, via-SMS messages. During

18  the conversation, UC and GODINEZ agreed to meet later in the day and conduct a drug

19  transaction. Due to the UC and GODINEZ conducting a one pound drug transaction on

20  June 5, 2019, UC and GODINEZ used short, concise, coded language to agree upon a

21  price and meet location. Specifically, during the conversation, UC specified "same thing,"

22

23  [2] The suspected methamphetamine was subsequently processed at DEA's Las Vegas District Office. The suspected methamphetamine weighed 503.6 gross grams and yielded a presumptive positive field test for methamphetamine.

1   to which GODINEZ responded with, "Ok." This confirmed that UC would again be

2   purchasing one pound of methamphetamine for $2,600.00 and the transaction would take

3   place at "Pep Boys" (3995 E. Charleston, Las Vegas, Nevada), which is adjacent to Ava's

4   Bar, 3935 E. Charleston Boulevard, Las Vegas, Nevada.

5         14.    Approximately two and a half hours after the first SMS message between

6   UC and GODINEZ, UC arrived in the parking lot of Pep Boys. Just prior to UC's arrival,

7   DEA personnel observed a black Chevrolet Equinox arrive in the parking lot of Ava's Bar.

8   An unknown female exited that vehicle, at which time DEA personnel briefly lost sight of

9   the parking lot (physical barriers passing between line of sight).

10        15.    A few minutes later, the UC exited the undercover vehicle (UCV) and

11   observed the black Chevrolet leave the parking lot of Ava's Bar and drive towards the UC.

12   The Chevrolet subsequently pulled into the parking spot next to the UCV. GODINEZ,

13   who was sitting in the back passenger seat, then rolled down the window. The UC

14   approached the Chevrolet and greeted GODINEZ. While greeting GODINEZ, the UC

15   observed two Hispanic males sitting in the front seat of the vehicle. The UC then greeted

16   the two males. Upon greeting everybody, the UC and GODINEZ engaged in conversation

17   and discussed procedures for future drug transactions.

18        16.    As the conversation ensued, GODINEZ, who had a black plastic grocery

19   bag on his lap, opened the black bag and showed the UC a clear plastic baggie that

20   contained a crystallized substance. UC immediately recognized the crystallized substance

21   to be consistent with methamphetamine. While GODINEZ was showing the UC the

22   suspected methamphetamine, the UC asked GODINEZ about lowering the price of

23   methamphetamine if the UC purchased a larger quantity (multiple pounds) during future

1  transactions. GODINEZ advised the UC that he would send the UC a SMS message at a

2  later time (with regard to reduced pricing for larger quantities). The UC then took the

3  black bag (containing the suspected methamphetamine)[3] and gave GODINEZ the

4  $2,600.00 OAF. GODINEZ then counted the OAF. Upon GODINEZ completing his

5  count of the OAF, UC gave all three individuals a departing salutation and walked back

6  towards UCV. The UC re-entered the UCV and exited the Pep Boys parking lot, while

7  GODINEZ and the Hispanic males drove back to Ava's Bar.

8       17.    On the afternoon of July 1, 2019, UC sent a SMS message to GODINEZ.

9  UC and GODINEZ subsequently engaged in a conversation, via-SMS messages. During

10  the conversation, UC and GODINEZ agreed to meet the next day and conduct a drug

11  transaction for two pounds of methamphetamine. It should noted that GODINEZ had

12  previously asked the UC to provide a one day notice before conducting future drug

13  transactions.

14       18.    On the morning of July 2, 2019, GODINEZ and UC confirmed the meet for

15  the drug transaction that had previously been agreed upon. Approximately two hours

16  later, CCGTF personnel established surveillance at 3995 E. Charleston (Pep Boys) and

17  3945 E. Charleston (Ava's Bar). While conducting surveillance, CCGTF personnel

18  observed GODINEZ arrive in the parking lot of Ava's Bar (in his gold Toyota). Several

19  minutes later, CCGTF observed Elio RAMIREZ-Guerrero (hereinafter referred to as

20  "RAMIREZ") arrive in the same parking lot in a blue sedan.

21

22

23

---

[3] The suspected methamphetamine was subsequently processed at DEA's Las Vegas District Office. The suspected methamphetamine weighed 421.6 gross grams and yielded a presumptive positive field test for methamphetamine.

19.     Several minutes after the arrival of GODINEZ and RAMIREZ, UC arrived in the Pep Boys parking lot.  CCGTF personnel then observed GODINEZ and RAMIREZ get into GODINEZ' Toyota and drive towards the UCV.  Upon arriving at the UCV, GODINEZ and RAMIREZ exited GODINEZ' vehicle and greeted the UC. UC, GODINEZ, and RAMIREZ then engaged in a conversation.

20.     During the conversation, UC, GODINEZ, and RAMIREZ began to negotiate how the drug transaction would be conducted.  Initially, RAMIREZ requested that the UC give him half of the agreed upon price, prior to producing the two pounds of methamphetamine.  The UC refused to participate in the suggested arrangement and continued to negotiate with GODINEZ and RAMIREZ.  After several minutes of negotiating, GODINEZ and RAMIREZ agreed to retrieve the methamphetamine and deliver it to the UC.  GODINEZ and RAMIREZ then left GODINEZ' Toyota parked next to UCV and walked back to the parking lot of Ava's Bar.

21.     Upon arriving at Ava's Bar, RAMIREZ and GODINEZ got into the blue sedan and departed from the area.  DEA personnel conducted mobile surveillance and followed the blue sedan to a house in a nearby neighborhood.  GODINEZ was observed exiting the blue sedan, at which time the blue sedan departed from the residence.  DEA personnel initially maintained mobile surveillance on the blue sedan, before returning to the residence that GODINEZ was dropped off.  Several minutes later, the blue sedan arrived back at the residence and GODINEZ entered the vehicle.  The blue sedan subsequently departed from the residence.

22.     DEA personnel maintained mobile surveillance and followed the blue sedan back to Pep Boys parking lot.  Upon arrival to the parking lot, RAMIREZ and/or

1  GODINEZ opened the trunk of the blue sedan, RAMIREZ and GODINEZ exited the

2  vehicle, and both subjects walked to the trunk of the vehicle. GODINEZ was observed

3  retrieving a bag from the trunk of the vehicle, at which time he walked to the rear driver

4  side of his Toyota. GODINEZ then opened the rear driver side door of his Toyota and

5  then placed the bag inside of the Toyota.

6       23.     As GODINEZ was placing the bag in the Toyota, UC and RAMIREZ

7  walked to the rear of GODINEZ' Toyota. GODINEZ allowed UC to see a paper bag,

8  which contained what appeared to be two pounds of a crystallized substance. UC

9  immediately recognized the crystallized substance as being consistent with

10  methamphetamine. UC then gave a pre-arranged arrest signal and began to walk to the

11  driver side of UCV.

12       24.     CCGTF personnel, displaying large law enforcement markings, then

13  approached RAMIREZ and GODINEZ and identified themselves. RAMIREZ

14  immediately complied with police commands and laid down on the ground. Upon seeing

15  CCGTF personnel approach, GODINEZ swiftly moved to the driver's door of the

16  Toyota, opened the door, and was observed discarding an item that he had retrieved from

17  the area of his waistband. GODINEZ then shut the door and began to swiftly move

18  towards the front of the Toyota. Upon reaching the front of the Toyota, GODINEZ was

19  confronted by CCGTF personnel, at which time GODINEZ finally complied with police

20  commands and laid on the ground. RAMIREZ and GODINEZ were both placed under

21  arrest.

22       25.     GODINEZ' Toyota was searched. Prior to entering the vehicle, CCGTF

23  personnel observed a silver 9 millimeter semi-automatic pistol (Model 1911) sitting in the

1  driver's seat of the vehicle.  The firearm was sitting in the same place that GODINEZ was

2  observed discarding an item.[4]  In addition, there was a cellular telephone lying next to the

3  firearm.  UC subsequently placed a telephone call to GODINEZ' cellular telephone,

4  which was positively identified as the cellular telephone next to the firearm.  It should be

5  noted that while interacting with GODINEZ, UC observed GODINEZ holding up his

6  pants.  UC advised that GODINEZ' behavior was consistent with carrying something

7  heavy in your waistband, such as a firearm.

8       26.     In addition, a brown paper bag was located in the rear driver side seat.  The

9  paper bag contained the following: tin foil wrapped around a heat sealed plastic bag,

10  which contained a crystallized substance; a plastic grocery bag, which contained a heat

11  sealed bag that was filled with a crystallized substance.[5]  The aforementioned brown paper

12  bag was the same bag that GODINEZ showed the UC, prior to the arrest of GODINEZ

13  and RAMIREZ.

14  ...

15  ...

16  ...

17  ...

18  ...

19  ...

20  ...

21

22  [4] NCIC records show that within the past ten years, GODINEZ has a felony conviction (State of Nevada) for Robbery with a Deadly Weapon.

23  [5] The suspected methamphetamine was subsequently processed at DEA's Las Vegas District Office.  The suspected methamphetamine weighed 939.0 gross grams and yielded a presumptive positive field test for methamphetamine.

1    27.    Based on my training and experience, I believe there is probable cause to

2   believe that GODINEZ and RAMIREZ violated Title 21, United States Code, Sections

3   841(a)(1) and (b)(1)(C), "Distribution of a Controlled Substance," Title 21, United States

4   Code, Section 846, "Conspiracy to Distribute Controlled Substances."

5

6                                            Special Agent Biff Z. Kellum
                                             Drug Enforcement Administration

7

8

9   SUBSCRIBED and SWORN to before me
    this 3rd day of July, 2019

10

11

12   HONORABLE BRENDA WEKSLER
    UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23